## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHRISTOPHER G.,

               Claimant,

      v.

FRANK J. BISIGNANO,
Commissioner of Social Security,

             Respondent.

No. 23 C 2197

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Christopher G.[1] ("Claimant") seeks judicial review of the final decision of the Commissioner of Social Security[2] ("Commissioner"), denying his application for disability insurance benefits. The parties consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment, pursuant to 28 U.S.C. § 636(c). [ECF No. 8]. After reviewing the record and the parties' briefs, the Court grants Claimant's request for reversal and remand of the ALJ's decision in Plaintiff's Opening Brief [ECF No. 22] ("Motion") and denies the Commissioner's Motion for Summary Judgment [ECF No. 25].

---

[1] In accordance with Northern District of Illinois Local Rule 8.1, the Court refers to Claimant only by his first name and the first initial of his last name.

[2] Frank J. Bisignano was confirmed as the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is automatically substituted as the named defendant in this case.

## BACKGROUND

### I.  Procedural History

On June 3, 2017, Claimant filed a Title II application for a period of disability and disability insurance benefits, alleging a disability beginning January 2, 2015. (R.13). His application was denied initially and on reconsideration after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R.13). A hearing was held on January 23, 2019. (R.13). Claimant testified at the hearing, and he was represented by counsel. (R.13). A vocational expert also testified at the hearing. (R.13). On March 14, 2019, the ALJ denied Claimant's application for supplemental security income and concluded that he was not under a disability within the meaning of the Social Security Act from January 2, 2015 through the date of the decision. (R.13-26). The Appeals Council denied Claimant's request for review, leaving the ALJ's decision as the final decision of the Commissioner. On June 6, 2022, the Court remanded for further proceedings. (R.791-807); *see Christopher G. v. Kijakazi*, 2022 WL 1989119 (N.D. Ill. June 6, 2022).

A telephone hearing was held on remand on November 3, 2022. (R.721). Claimant testified at the hearing, and he was represented by counsel. (R.721). A medical expert and a vocational expert also testified at the hearing. (R.721). On January 4, 2023, the ALJ denied Claimant's application for disability insurance benefits and concluded that he was not under a disability within the meaning of the Social Security Act from January 2, 2015 through the date of the decision. (R.721-743). Claimant did not file a Request for Review with the Appeals Council, and the parties do not dispute that the ALJ's decision is the final decision of the

2

Commissioner. *See* Complaint for Judicial Review [ECF No. 1] at ¶ 6 (citing 20 C.F.R § 404.984); *see also* Motion [ECF No. 22] at 5; Defendant's Memorandum in Support of Motion for Summary judgment [ECF No. 26] ("Response"). Claimant then filed this lawsuit seeking judicial review of the Commissioner's decision, and this Court has jurisdiction pursuant to 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## II. The ALJ's Decision

Under the Social Security Act, disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part, sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 416.920(a). The Commissioner must consider whether: (1) the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity ("RFC") to perform any past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). The claimant bears the burden of proof at steps one through four, and the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021);

3

*Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

Applying the five-part test in this case, the ALJ found at step one that Claimant had not engaged in substantial gainful activity since January 5, 2015, the date he filed his application. (R.724). At step two, the ALJ found Claimant had the following severe impairments: blindness of right eye; optic neuralgia; status-post cerebrovascular malformation and dural arteriovenous fistula; depression; anxiety; and alcohol use disorder. (R.724). At step three, the ALJ found that even with Claimant's substance abuse disorder, Claimant did not have an impairment or combination of impairments that met or equaled the severity of any listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (R.725).

With respect to Claimant's mental impairments including the substance use disorder, the ALJ undertook the paragraph B analysis and determined that with Claimant's substance abuse, Claimant had extreme limitation limitations in three areas of functioning including: (1) understanding, remembering or applying information; (2) concentrating, persisting and maintaining pace and (3) adapting and managing himself, and a marked to extreme limitation in interacting with others. (R.726-727). At step four, the ALJ found that Claimant is unable to perform any past relevant work. (R.730). At step five, the ALJ concluded based on all Claimant's impairments, including the substance use disorder, there were no jobs that existed in significant numbers in the national economy that Claimant could have performed.

4

(R.731). Accordingly, the ALJ determined that Claimant was disabled considering all of Claimant's impairments, including the substance use disorder. (R.732).

The ALJ also found that Claimant's substance abuse was material to the determination of disability (R.729-30).[3] The ALJ determined that without Claimant's substance abuse, Claimant did not have an impairment or combination of impairments that met or equaled the severity of any listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (R.732). The ALJ undertook the paragraph B analysis considering if Claimant stopped the substance use and found Claimant had: (1) a mild limitation in understanding, remembering or applying information; (2) no limitations in concentrating, persisting and maintaining pace; and (3) no limitations in adapting and managing himself; and (4) a moderate limitation in interacting with others. (R.733-734). Before step four, the ALJ determined:

> [I]f the [C]laimant stopped the substance abuse, the [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is able to avoid ordinary hazards in a workplace, such as doors ajar and boxes on the floor. The [C]laimant can read ordinary print, such as in newspapers and books. He can perform tasks that do not require precise depth perception such as threading a needle. He can tolerate a low stress

---

[3] "An individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). If an ALJ finds that a claimant is disabled and has medical evidence of alcoholism or drug abuse, the ALJ must determine whether alcoholism or drug addiction is a contributing factor material to a determination of disability. 20 C.F.R. § 404.1535(a). To do so, the ALJ applies the five-step inquiry a second time to determine whether the claimant would still be disabled if her alcohol or drug use stopped. 20 C.F.R. §§ 404.1535(b), 416.935. While plaintiff bears the burden to prove that substance abuse is not a contributing factor material to her disability, the ALJ must still "adequately disentangle" the effects of a plaintiff's substance abuse from those of her other impairments. *Harlin v. Astrue*, 429 Fed. App'x 564, 567-68 (7th Cir. 2011).

5

environment involving simple repetitive tasks. He can tolerate occasional interaction with supervisors, co-workers, and the public.

(R.734). At step four, the ALJ found that Claimant is unable to perform any past relevant work. (R.741). At step five, the ALJ found there were jobs in the national economy Claimant could perform based on the testimony of the vocational expert who opined that Claimant could perform the jobs of janitorial cleaner, housekeeping cleaner, and hand packager. (R.741). Based on these findings, the ALJ concluded Claimant was not disabled. (R.743).

## DISCUSSION

### I.  Judicial Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision, therefore, is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the correct legal standard in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). An ALJ's decision should be affirmed even in the absence of overwhelming evidence in support: "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence is ... 'more than a mere scintilla.' ... It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a

6

conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Seventh Circuit has made clear that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024) (citations omitted). More specifically, the Seventh Circuit stated:

> All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is "sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review." … At times, we have put this in the shorthand terms of saying an ALJ needs to provide a "logical bridge from the evidence to his conclusion."

*Id.* at 1054 (citations omitted). When conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict.") (internal quotations and citation omitted). The court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable

minds could differ'" as long as "the decision is adequately supported") (citation omitted).

## ANALYSIS

Claimant argues that remand is required in this case because (1) the ALJ's Step Five determination was not supported by substantial evidence; (2) the ALJ failed to account for Claimant's headaches and concentration, persistence or pace limitations in the RFC; (3) the ALJ ignored the opinions of state agency consultants finding he should be restricted to one and two step instruction tasks; (4) the ALJ failed to account for Claimant's need for more than occasional contact with supervisors during a probationary period in the RFC; and (5) the ALJ's evaluation of Claimant's subjective symptoms was not supported by substantial evidence. For the reasons discussed below, the Court finds remand is required on the ALJ's Step Five determination.

### A. ALJ's Step Five determination was not supported by substantial evidence

At step five, the burden shifts from the Claimant to the Commissioner to demonstrate that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations. *Gedatus*, 994 F.3d at 898. In a 2022 per curium opinion, the Seventh Circuit held "when a claimant challenges a vocational expert's job-number estimate, the ALJ must inquire whether the methodology used by the expert is reliable." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) ("Administrative law judges often rely on vocational experts to estimate these job numbers. But ALJs cannot afford complete discretion to vocational

experts."). "[S]ubstantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology," *Ruenger*, 23 F.4th at 763, meaning it is based on "well-accepted" sources and the VE explains his or her methodology "cogently and thoroughly." *Biestek*, 139 S. Ct. at 1155. This "is not a high threshold" and "requires only enough 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Case v. Kijakazi*, 2023 WL 4882880, at *3–4 (7th Cir. Aug. 1, 2023) (quoting *Biestek*, 139 S. Ct. at 1154). "Thus, the expert's explanation of the methodology that he used to produce his estimate must be 'reasoned and principled' enough to instill some confidence that the estimate was not 'conjured out of whole cloth.' " *Id.*

The vocational expert testified at the hearing in this case that an individual with restrictions aligning with the RFC could perform certain jobs that are significantly available in the national economy. (R.1503.) The expert explained he used the Bureau of Labor Statistics, which classifies jobs using the Standard Occupational Classification ("SOC") system, to provide job number estimates for three SOC codes: janitorial cleaner (760,000 jobs available), housekeeping cleaner (380,000 jobs available), and hand packager (300,000 jobs available). (R.1504, 1505-1506.) *See also* (R.741 (ALJ opinion citing job number estimates.) The expert also identified a Dictionary of Occupational Titles ("DOT") job title within each of the three SOC codes. (R.1504.) The expert explained, however, that his job number estimates were based on the entire SOC code rather than the individual DOT job title. (R.1506 ("Q: And those estimated employment numbers based on DOT titles or were they

based on SOC codes? A: They are broken down by specific DOT numbers, no. Q: Are they referring to specific SOC codes? A: Yes, SOC codes, yeah, correct. Q: Okay. So, for example in the 760,000 number that you gave for the janitor cleaner, that's referring to all of the jobs within the SOC code? A: Correct. Q: … is the difference between an SOC code and the DOT title mainly that the SOC code contains multiple jobs or industries and the DOT title is only particular to a certain job title? A: That's generally the way to explain it . . .")). The expert also used SkillTRAN's Job Browser Pro software to identify the percentages of full-time positions available within each SOC code to reduce his estimates to account for only full-time jobs. (R.1509, 1512-1513.)

Claimant attacks the reliability of the vocational expert's testimony on various grounds. As an initial matter, Claimant suggests the SkillTRAN program does not employ reliable methods for its job number estimates, Motion [ECF No. 22] at 7, 9-10, but Claimant does not reconcile this argument with the vocational expert's testimony that he did not rely on SkillTRAN for his estimates. As explained above, the expert testified his estimates came from the Bureau of Labor Statistics' SOC codes and that he used SkillTRAN's Job Browser Pro to identify a percentage of full-time positions to reduce those estimates. (R.1505-06, 1509, 1522). Moreover, although Claimant asserts the expert employed the same methodology of relying on SkillTRAN that warranted remand in *Christopher O. v. Kijakazi*, 2022 WL 3026937, at *2–5 (N.D. Ill. Aug. 1, 2022), it is not clear that is the same methodology the expert used here. *See* Motion [ECF No. 22] at 10 (arguing vocational expert's prior testimony in

*Christopher O.* shows "he did not have the ability to sufficiently explain SkillTRAN in a manner acceptable by this court. . ."). In any event, the Court's consideration of a vocational expert's testimony must be a "'case-by-case' inquiry" that "considers 'all features of the [expert's] testimony' to determine whether the testimony establishes 'more than a mere scintilla' of evidence supporting the ALJ's conclusion.'" *See Chavez v. O'Malley*, 96 F.4th 1016, 1022 (7th Cir. 2024) (internal citations omitted). For this reason, the fact that another court remanded where this vocational expert testified is not necessarily itself a reason for remand in this case.

Claimant also argues, however, that the vocational expert could not explain how Job Browser Pro estimated full-time and part-time job percentages. Motion [ECF No. 22] at 11. This argument is persuasive. The expert testified he relied on percentages from Job Browser Pro for his calculation of full-time jobs within the SOC codes but he could not identify the sources Job Browser Pro used to generate those percentages:

> Q: So, now getting back to the full-time work and so, how again did you . . . come up with the full-time and part-time discrepancies based on Job Browser Pro?
>
> A: I basically just looking off of Job Browser Pro . . . I just put the number for the Bureau of Labor Statistics . . . and then I multiply by the 70 percent to come up with the . . . 1.4 I think it was for Janitor.
>
> Q: So, does Job Browser Pro give you any source at all as to where they got their full-time and part-time estimates from?
>
> A: They might but I'm not seeing where they got it from.
>
> Q: Oh so, are you . . . aware of any sources that they use for estimation purposes?

> A: Well I know they're, I know – no. I specifically do their estimation of full-time, part-time, no, I'm not quite sure how they come into."

(R.1512-1513.) The Commissioner responds that vocational experts are not required "to reveal the precise mechanics and statistical model involved" in their sources. Response [ECF No. 26] at 8 (citing *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) ("Though the VE's description did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard.")). While this may be true, the expert here not only could not explain how SkillTRAN's Job Browser Pro software determined full-time job percentages, he also could not identify the sources the program relied on for that information. *See* <u>*Wegerer v. Kijakazi*</u>, 2023 WL 6307407, at *4 (W.D. Wis. Sept. 28, 2023) ("this court has held that when a vocational expert relies on numbers derived from Job Browser Pro, 'the VE needs to be able to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable.'") (quoting *Staples v. Kijakazi*, 2023 WL 2753855, at *5 (W.D. Wis. Apr. 3, 2023)). That is not just mechanics; it is the basis for the expert's testimony.

In considering a vocational expert's reliance on SkillTRAN data, such as the expert's use of SkillTRAN full-time job percentages here, "the issue is 'not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden.'" *Michelle S. v. Kijakazi*, 2022 WL 4551967, at *6 (N.D. Ill. Sept. 29, 2022) (Gilbert, J.) (citing *Dunn v. Kijakazi*, 2021 WL 5105169, at *12 (E.D.

Wis. 2021) and *Bruno v. Saul*, 817 Fed. Appx. 238, 243 (7th Cir. 2020)). The Seventh Circuit has not endorsed reliance on data obtained from Job Browser Pro as *per se* reliable and "the Court agrees with the many decisions in which courts consider additional indicia of reliability, such as the VE's reconciling or adjusting SkillTRAN estimates based on the expert's own professional experience, before concluding an expert's methodology is supported by substantial evidence." *Agnieszka P. v. O'Malley*, 2024 WL 325297, at *7 (N.D. Ill. Jan. 29, 2024) (Gilbert, J.) (collecting cases). In this case, the expert's testimony did not "cogently and thoroughly" explain his methodology of relying on Job Browser Pro's full-time percentages after direct challenge by Claimant. *Biestek*, 139 S. Ct. at 1155. Nor did the ALJ pursue any inquiry about this issue. Absent meaningful inquiry, the ALJ did not establish – nor can this Court confirm – that substantial evidence supported the expert's methodology of relying on Job Browser Pro's full-time job percentages to reduce job estimates initially derived from SOC codes.

The ALJ also failed to inquire as to the reliability of the expert's methodology for providing job number estimates specific to DOT job titles. The Dictionary of Occupational Titles "does not estimate how many positions exist in the national economy for each job title" and:

> [b]ecause of this, vocational experts commonly use another source produced by the Department of Labor that does provide job-number estimates: the Occupational Employment Survey. Unfortunately for vocational experts, this publication organizes its estimates not by DOT job titles but by another classification system, the "standard occupational classification" (SOC) system. SOC codes sort jobs into broad occupational categories, such as "mathematicians" (SOC 15-2021) or "electrical engineers" (SOC 17-2071), that each encompass multiple

> DOT job titles. This creates a matching problem: vocational experts can identify the number of jobs in the larger SOC grouping but cannot identify how those jobs are distributed among individual DOT job titles within that grouping.

*Ruenger*, 23 F.4th at 761–62 (internal citations omitted) (also citing *Chavez v. Berryhill*, 895 F.3d 962, 966 (7th Cir. 2018)). The Seventh Circuit has held vocational experts must provide a reliable methodology for estimating the number of jobs associated with a DOT job title falling within a larger SOC code or industry group. *See Ruenger*, 23 F.4th at 761–62.

Claimant contends the expert here either (1) failed to provide a reasoned explanation for his job number estimates because the expert did not explain how he narrowed his estimates stemming from SOC codes to correspond to the DOT job titles he identified or (2) failed to even engage in this necessary step. Motion [ECF No. 22] at 6-16. Claimant says the expert "clearly stated that he took job numbers from the BLS and went to Job Browser Pro to figure out how many full-time jobs there were" and otherwise "stated his numbers represented jobs in the entire SOC code, not a particular DOT title." Motion [ECF No. 22] at 15.

The vocational expert acknowledged each SOC code he considered in forming his job number estimates encompassed a larger number of DOT job titles. (R.1523); *see* Response [ECF No. 26] at 4 (citing expert's testimony that "the SOC code corresponding to the job of housekeeping cleaner contained nine DOT codes, the SOC code corresponding to the job of janitorial cleaner contained 15 DOT codes and the SOC code corresponding to the job of janitorial cleaner contained 59 DOT codes"). The Commissioner says the expert "explained how he took the job number estimate

14

applicable to the entire SOC code and broke it down to determine the approximate number of jobs that plaintiff could perform." [*Id.*] Claimant disagrees, saying the vocational expert did not explain how, or even whether, the expert's job number estimates were tailored to the identified DOT job titles. *See* Motion [ECF No. 22] at 11 ("The VE put forth no basis for eroding job numbers based on particular or representative DOT title."); Plaintiff's Reply Brief [ECF No. 27] ("Reply") at 2 ("The VE testified that his method merely eroded job numbers from an SOC code and did not cross-walk or cross-reference those SOC jobs with a particular or representative DOT title despite testifying under oath that he was giving jobs consistent with certain DOT titles."); 3 ("Defendant does not state . . . why it is reliable despite the fact that the VE ultimately stated he took job numbers for an entire SOC code and then eroded that job based upon nothing more than SkillTRAN's full-time employment percentage estimate for the entire SOC group.").

Ultimately, the Court cannot clearly discern from the ALJ's opinion or the hearing transcript how (or if) the expert provided job number estimates tailored to the DOT job titles identified as potentially available to Claimant by the expert. The vocational expert explained different methodologies he *could* employ to narrow estimates derived from SOC codes, including labor market studies and the equal distribution method (which divides the total number of jobs estimated for an SOC code by the number of DOT job titles falling within that code). (R.1524-26.) The expert explained he uses the equal distribution method when the number of DOT job titles is very large, because in those circumstances it would not be practical to perform labor

market studies for so many job titles. (R.1525 (explaining "equal distribution . . . sometimes that's the best we've got. But other times we can take another step. . . verifying through labor market surveys . . .").) It is not clear to the Court, however, which, if any, of these methods the expert applied here.

Nor does the Commissioner provide a coherent explanation of the expert's methodology. The Commissioner said the expert "explained that one method is to perform labor market surveys and that he had, in fact, performed such studies" and that the expert "relied on [his] experience having conducted [labor market studies] over the years in relation to the janitorial cleaner and housekeeping cleaner positions, and he relied on the equal distribution method in relation to the hand packager position." Response [ECF No. 26] at 4-5. The Commissioner fails to reconcile this explanation with the expert's testimony that he did not rely on any labor market studies for his analysis of the job number estimates for the three DOT job titles in this case:

> Q: And just for clarification, you are not relying on any labor studies for any of these three jobs. Is that correct?
>
> A: No. I don't think so because we – I'm not having to parse it out. They're any exertion but the housekeepers were – you know, those were unskilled. Janitorial cleaners, yeah, unskilled. The packager, I mean they're basically all unskilled so I didn't have to rely on any labor market studies but rather just my experience having conducted these over the years.

(R.1525-26.) Moreover, while the expert said he relied on his experience having conducted labor studies over the years, it is not clear how the expert did so to calculate the job number estimates for each of the three DOT job titles here. (*Id.*)[4]

As to the housekeeping cleaner position, the expert estimated there would be 380,000 light work, unskilled, SVP: 2, housekeeper cleaner jobs available in the national economy. (R.1504). The expert explained that although there are nine DOT job titles associated with the SOC code for housekeeping cleaner, in his view "there are only two legitimate DOT in that OES group. They're both unskilled, SVP:2. So, I can make the assumption that all the job numbers cited in the Bureau Labor Statistics are referring to an SVP:2." (R.1508; *see also* R.1523-24.) The expert did not explain what he meant by "legitimate" job titles or why he dismissed seven of the nine DOT job titles in this SOC group. The expert testified one of these two housekeeping cleaner DOT job titles is at the light exertion level and the other is at the medium level. (R.1524-25.) The expert also testified "the equal distribution method would say there are 383,000 light and 43,000 medium," which initially appears to align with the expert's 380,000 estimate for the light level housekeeper cleaner position. (*Id.*) But the expert then walked back that testimony, saying:

> oh, no, no, no. I'm sorry. . . Let me rephrase that. Because I said there's two legitimate DOT titles it would suggest that both of these DOT titles are exactly the same numbers. . . . So, it would be the same number of hospital housekeepers as . . . hotel housekeepers. And that didn't really sound right as I've experienced. So, then what I need to do from that

---

[4] The Commissioner also says the expert "repeatedly stated he had personally observed the jobs being performed" but does not explain how that translates into a methodology for reducing the job estimates from SOC codes to the identified DOT job titles. Response [ECF No. 26] at 5.

> point is I need to breaking these down to employer and see what I can found out whether that's correct or not. And we can do labor market surveys to try and support to refute our own for that law of equal distribution (*sic*). . .

(*Id.*)

It is not clear from this testimony whether the expert testified that additional analysis was necessary in order to breakdown the available jobs between the two DOT titles or whether he performed any additional analysis to accomplish this step (as noted above, the expert testified he did not rely on any labor market studies for his job estimates in this case). Ultimately, the record does not contain enough information for the Court to understand what method the expert applied to calculate his 380,000 jobs estimate for the housekeeper cleaner position. *See Ruenger*, 23 F.4th at 763 ("Because the expert failed to set forth an understandable methodology, we cannot review her methodology, let alone confirm that it was reliable."); *Curtis v. Kijakazi*, 2022 WL 17581776, at *3 (E.D. Wis. Dec. 12, 2022) ("This confusing effort at explanation makes meaningful review nearly impossible. Like the Court in *Ruenger*, despite multiple passes at the transcript, this Court 'cannot discern the VE's methodology.'").

With respect to the hand packager job, the Court also cannot discern from the record how the vocational expert reached his 300,000 job number estimate. While the expert testified he "relied on the equal distribution method for the hand packagers," (R.1526), it is not apparent how that calculation resulted in the 300,000 estimate. The expert explained that to estimate hand packager job numbers for a specific DOT job title using the equal distribution method, he would divide the total number of

18

available (presumably full-time, based on Job Browser Pro's percentage) jobs for the hand packager SOC code, which the expert said was 458,000, by the number of DOT job titles in this category (59), but that calculation would result in approximately 7,762 jobs, far lower than the 300,000 estimate the expert provided. *See* (R.1526-27). Again, where "the expert failed to set forth an understandable methodology, we cannot review [his] methodology, let alone confirm that it was reliable." *See Ruenger*, 23 F.4th at 763.

Finally, as to the janitorial cleaner position, the expert estimated there would be 760,000 medium work, unskilled, SVP: 2, janitorial cleaner jobs available in the national economy. (R.1504). The expert explained the janitorial cleaner SOC code includes over 2 million jobs, but he applied the Job Browser Pro full-time percentage of 70% to reduce that estimate to 1.4 million full-time jobs. (R.1519.) As the expert's estimate for the janitorial cleaner position was 760,000, not 1.4 million, it appears the expert did something to further reduce his estimate. To that end, the expert explained there are 15 DOT job titles within the janitorial cleaner SOC code, but "in reality there's only half of those I have found from conducting labor market surveys over the years, half of them are actually performed at the light level" and he further noted "[t]here's one janitorial DOT at medium." (R.1523-25.) Although this testimony is somewhat unclear, it may mean that, based on the expert's experience conducting labor market studies, about half the estimated 1.4 million full-time jobs for this SOC code are performed at the light level, which would seem to leave the remaining half of the jobs to fall within the single medium exertional level janitorial cleaner DOT job

title that the expert identified. This seems arguably consistent with the 760,000 jobs estimate the expert provided for this job title, as it would roughly represent half of the 1.4 million full-time positions the expert testified fell within the SOC code.

Claimant, however, also submitted evidence that SkillTRAN's estimate for the DOT job title the expert identified for the janitorial cleaner position (cleaner, industrial - 381.687-108) was 17,000 full-time jobs, a number that is vastly different than the expert's estimate of 760,000 full-time jobs. Motion [ECF No. 22] at 7. As the Commissioner points out, Claimant does not argue 17,000 janitorial cleaner jobs would necessarily be insignificant. Response [ECF No 26] at 7. The Commissioner also argues the ALJ was not obligated to resolve this conflict because "ALJs are only required to address apparent conflicts between the DOT and the VE's evidence" not a conflict with SkillTRAN numbers. Response [ECF No. 26] at 7 (citing Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). While that may be true, the Commissioner's argument misses the larger point. As the Commissioner acknowledged, an ALJ is entitled to rely on a vocational expert's estimate "as long as the VE's estimate was the product of a reliable method." [*Id.*] The Court understands Claimant's criticism to be that this substantial discrepancy between the SkillTRAN job estimate and the expert's 760,000 estimate raises questions about the reliability of the expert's methodology that needed to be resolved, yet the ALJ did not address this issue at all. Motion [ECF No. 22] at 7; Reply [ECF No. 27] at 8.

The Court is reluctant to find the vocational expert's estimate for janitorial cleaners to be unreliable merely because it differs from a SkillTRAN job number

estimate, provided from a source Claimant contends is unreliable, a point the Commissioner also makes. Response [ECF No. 26] at 7. Nevertheless, the Court agrees (as discussed further below) that the ALJ did not address this substantial estimate discrepancy in her opinion or during the hearing. At a minimum, this leaves the Court uncertain as to the reliability of the expert's methodology for the janitorial cleaner estimate.

Turning to the ALJ's opinion at Step Five, the Court is cognizant that the burden remains on the agency at this step of the analysis. To that end, Claimant argues the ALJ failed to address his objections to the vocational expert's testimony. Specifically, Claimant says the ALJ noted his "objections procedurally, but did not assess the substance of the objections at all." Motion [ECF No. 22] at 15. The Court agrees.

The ALJ's opinion generally acknowledges Claimant's objections and dismisses those objections with boilerplate affirmations of the vocational expert's experience and expertise. The ALJ said she determined the expert's testimony was consistent with the information contained in the DOT and "matters not addressed by the DOT, were considered according to [the expert's] education and professional experience." (R.742.) The ALJ noted Claimant's objections, raised in a pre-hearing memorandum and at the hearing, "to the vocational expert's testimony, the available job numbers, and the way the vocational expert obtained such available job numbers," including that "the publications used by the vocational expert to obtain job numbers and data . . . do not list jobs according to the Dictionary of Occupational Titles." (R.742.) The

21

ALJ observed that before the hearing, the Claimant requested a subpoena duces tecum for materials relied on by the expert, including third-party software, as well as sufficient time to cross-examine the vocational expert. (R.742.)[5] The ALJ also noted after the hearing Claimant "objected to the use of JobBrowserPro, the use of SOC, the job numbers offered by the vocational expert, and the way the vocational expert obtained his job numbers." (R.742.) Notwithstanding these descriptions of Claimant's objections, the ALJ dismissed them as "blanket objections." (R.743.)

The ALJ overruled Claimant's objections primarily because Claimant's representative was able to cross-examine the vocational expert in depth at the hearing. (R.742.) The ALJ concluded that based on the full record, and considering "the representative's opportunity to fully cross-examine the vocational expert at the hearing," "the vocational expert's testimony conforms to the Agency's rules and regulations" and therefore accepted the expert's testimony. (R.743). While the ALJ said "[t]he vocational expert provided an adequate explanation as to how he arrived at his job numbers," the ALJ did not provide any explanation of that methodology or say why she found it to be reliable. (R.742.) Nor did the ALJ address the objections to the expert's reliance on Job Browser Pro for full-time job percentages. (R.742.) The ALJ noted the expert's opinions were based in part on publications for which the agency may take administrative notice, (R.742), but did not address that SkillTRAN's

---

[5] Contrary to Claimant's argument that the ALJ never ruled on the subpoena, Motion [ECF No. 22] at 13, the ALJ denied the request for production of the expert's documents, noting Claimant's representative did not ask for production at the hearing. (R.742.)

Job Browser Pro (which the expert relied on for the full-time percentages) is not included in that list. *See* 20 C.F.R. § 404.1566(d).

The ALJ also pointed to the vocational expert's "professional knowledge and experience in job placement" but knowledge and experience alone are not sufficient to make an expert's methodology reliable, absent some explanation of how the expert applied that knowledge and experience. *See Hohman*, 72 F.4th at 254 ("Notice what we are not saying. We are not saying that a VE's testimony passes the substantial-evidence threshold based on a VE's credentials or expertise alone."). Here, the ALJ did not describe how the expert relied on his professional knowledge or experience to reach his job number estimates, nor did the ALJ articulate how the expert had calculated job estimates for the three DOT job titles he identified.[6]

---

[6] Claimant also says the ALJ failed to consider evidence he submitted in his post-hearing brief showing that based on a different job source, O*NET, all the jobs identified by the vocational expert would have been at an SVP Level between 3 and 6, rather than SVP Level 2, as argued by the expert, and therefore would have exceeded the RFC. Motion [ECF No. 22] at 14. While the ALJ did not address this issue, Claimant does not explain why the ALJ needed to consider information from O*NET. As the Commissioner points out, the DOT skill level, which was relied upon by the vocational expert here, is controlling, a point that Claimant fails to address on Reply. Response [ECF No. 26] at 7; *see also* SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000) ("The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 . . . Although there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling."). Claimant cites *Jaquez v. Saul*, No. 19-56235 (9th Cir. 2021), arguing "the Ninth Circuit relied on the O*NET as a basis for finding that work was not full time." Motion [ECF No. 22] at 15. But it is not clear that the evidence warranting remand in *Jaquez* was from O*NET. *See id.*, 840 F. App'x 246 (noting "Jaquez submitted evidence suggesting that 90% of ushers work part-time" without identifying the evidence at issue). In any event, the Court does not see how *Jaquez* supports Claimant's position that the ALJ erred by not considering O*NET evidence as to skill levels.

The ALJ also found "[b]ased on the vocational expert's extensive education and background, it is reasonable to trust that the vocational expert used reliable sources to shed light on whether 'significant' job numbers exist in the national economy." (R.742.) *See* Reply [ECF No. 27] at 7 ("the ALJ accepted the VE testimony largely upon the VE's alleged experience in estimate job numbers and stated that such experience and education was worthy of her trust"). The suggestion that it was reasonable to "trust" the expert falls short of the ALJ's obligation to confirm the expert's methodology is reliable. *See Engel v. Kijakazi*, 635 F. Supp. 3d 661, 666 (E.D. Wis. 2022) ("'Trust me; I'm an expert' is not a basis on which to deny someone's request for disability payments.").

The ALJ also noted "the claimant's representative has failed to provide any affirmative vocational evidence in support of" his claims, including "that the vocational expert's testimony was inconsistent with the information contained in the DOT or other administratively noticed publications" and therefore concluded "the undersigned is left with no probative evidence on which to disregard such testimony." (R.743.) Rejecting Claimant's objections based on his lack of "affirmative vocational evidence" to contradict the expert's testimony, however, is contrary to and inconsistent with the proper placement of the Step Five burden on the agency.

"The ALJ must 'hold the [vocational expert] to account for the reliability of [his] job-number estimates.'" *Ruenger*, 23 F.4th at 764 (quoting *Chavez*, 895 F.3d at 970). Although the cross-examination of the expert at the hearing left unclear how the expert had determined his job number estimates, whether the estimates were specific

24

to DOT job titles, and whether the expert had adequately explained the reliability of Job Browser Pro's full-time percentages, the ALJ did not ask the expert to explain any of these aspects of the expert's methodology. *Id.* ("But even after cross-examination raised doubts about the expert's methodology, the ALJ here did not ask the expert to clarify what she meant by 'names of jobs,' whether such names are different from SOC codes, or the reason she used the equal distribution method. Thus, nothing in the administrative record allows us to conclude that the vocational expert's estimates reasonably approximate the number of suitable jobs that exist for Ruenger."). As the Seventh Circuit explained, "[w]e are mindful of the time constraints and heavy caseloads faced by ALJs. But when a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology. This may require that ALJs ask more questions of vocational experts or slow down proceedings to give claimants a greater opportunity to pose their own questions. Otherwise, ALJs risk shifting the agency's evidentiary burden to the claimant." *Id.*

The Commissioner argues this case should be controlled by *Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023), where the Seventh Circuit affirmed an ALJ's reliance on a vocational expert's testimony as supported by substantial evidence. In the Court's view, there are relevant differences in this case compared to the circumstances in *Fetting* that make that decision distinguishable. First, in *Fetting*, the expert explained in a manner that "was sufficiently cogent and thorough for the ALJ to rely on it" how he calculated the estimate of available jobs in the housekeeping

cleaner position, by acknowledging "the numbers in the OES refer to groupings that encompass 'several occupations'" and explaining that "to convert the OES statistic into estimates for individual DOT occupations, he 'look[ed] at the composition of a[n] [OES] group' and, using his 'knowledge of the labor market, [acquired] over 30+ years of job placement activities,' determined the relative prevalence of each job in that group." *Id*. The expert also explained how he applied his knowledge of the labor market specifically to the identified DOT job titles. The expert "testified that 'the cleaner/housekeeping position is in a group with nine other DOT occupations,' totaling 925,000 positions nationwide. Based on his experience, a '[c]leaner, housekeeping position is something that's found at many different industries and that would be one that would ... make up a larger portion of the total group.' He therefore concluded that there are about 200,000 jobs in the national economy for cleaners/housekeepers." *Id*. While the Seventh Circuit acknowledged "the VE could have explained his methodology more clearly" it concluded "he gave enough detail for us to understand the sources of his data and the general process he adopted" including "that he used the OES numbers and his thirty years of job placement experience to calculate his estimates." *Id*.

By contrast, how the expert used his "experience" remains unclear in this case, as he did not cogently and thoroughly explain how he narrowed the estimate of available jobs from the SOC codes to DOT titles. For example, in addressing the same housekeeping cleaner SOC code discussed in *Fetting*, the expert here said only two of the nine DOT job titles were "legitimate" although he did not explain why. (R.1508,

R.1524). The expert then offered a confusing explanation of how he estimated the number of available jobs for the specific housekeeping cleaner DOT job title he had identified, providing one set of numbers, asserting he used the equal distribution method, then acknowledging he did not use that method, and then asserting he needed to take additional steps to break down the job number estimates without explaining if he actually did so. (R.1524-25). Unlike the expert's explanation in *Fetting*, the expert here did not coherently describe how he reached the 380,000 estimate he provided for this job title.

Second, the Seventh Circuit in *Fetting* found the claimant had "forfeited" his objections to the expert's methodology, including whether the expert considered only full-time jobs, by "failing to ask any questions about them at the hearing," circumstances not present here, where Claimant raised his objections in multiple pre- and post-hearing briefs and during cross-examination. *Id.* at 339-40.

Finally, the Seventh Circuit in *Fetting* rejected the argument that the ALJ had "'fail[ed] in his duty of inquiry' and did not ask sufficient additional questions during the hearing to determine whether the VE's calculations were reliable" because the "VE's testimony did not give the ALJ any reason to suspect that his methodology was unreliable." *Id.* Here, as discussed above, Claimant's pre-and post- hearing briefs, his cross-examination of the expert at the hearing, and the expert's testimony raised sufficient questions about the expert's methodology that the ALJ was required to further inquire as to its reliability to satisfy the Step Five burden.

27

To that end, Claimant relies on *Christopher O. v. Kijakazi*, 2022 WL 3026937, at *2–5 (N.D. Ill. Aug. 1, 2022), where the court remanded based on the conclusion that Dr. Craig Johnston, the same vocational expert who testified in this case, had failed to sufficiently explain why his methodology was reliable. Motion [ECF No. 22] at 10, 12. As the Court previously observed, it is not clear the expert's methodology in *Christopher O.* is the same as that employed in this case: in particular, it does not appear the expert in this case relied on SkillTRAN for his job number estimates, other than applying the full-time job percentages obtained from SkillTRAN's Job Browser Pro. (R.2509, 1522-23). Nevertheless, there are similarities between this case and *Christopher O.* that bear mentioning.

As an initial matter, the Commissioner attempts to distinguish the circumstances of this case because Claimant's counsel was given "unfettered opportunity to question the VE" as compared to in *Christopher O.* where counsel's examination was cut short. *See* Response [ECF No. 26] at 6. But the court in *Christopher O.* also noted "Plaintiff's counsel cross-examined Dr. Johnston extensively about the sources and methodology he utilized to produce his job numbers." *Christopher O.*, 2022 WL 3026937, at *2–5. Although the court did note further cross-examination was cut short, the reason remand was warranted was that notwithstanding an extensive cross-examination and further objections in a post-hearing brief, the ALJ did not resolve questions about the expert's methodology and therefore failed to identify substantial evidence supporting its reliability. *Christopher O.*, 2022 WL 3026937, at *2–5.

28

For example, the court noted "the ALJ was fully aware of counsel's concerns about the VEs' methodology for producing job numbers. Yet, contrary to the Commissioner's argument, [the previous vocational expert] and Dr. Johnston never fully explained their methodology for determining the number of jobs when comparing SOC and DOT codes." *Id.* at *4. As discussed above, that is similar to the circumstances here, where the expert did not clearly explain how he performed this step of the analysis. In addition, the court in *Christopher O.* noted Dr. Johnston said he "goes the 'extra step' of using labor market surveys to confirm the job numbers for a representative DOT code. But it remains unclear how Dr. Johnston utilized these surveys to determine if the equal distribution method among the DOT codes is an accurate representation of actual jobs." *Id.* Again, this is similar to the uncertainty surrounding the expert's explanation of his methodology in this case.

In addition, Dr. Johnston testified in *Christopher O.* that he relied on his experience to "eliminate" certain DOT codes from the larger SOC code, again similar to his testimony in this case. *Id.* As the court observed in *Christopher O.*, however, "even if certain DOT codes were eliminated, Dr. Johnston offered no explanation as to why the DOT codes that remained would be evenly distributed" nor did Dr. Johnston "explain how he analyzed this evidence to 'give a different number' when necessary." *Id.* Again, this is similar to the uncertainty surrounding the expert's testimony regarding his estimates for the housekeeper job in this case, including whether he performed the additional analysis he appeared to say would be necessary to determine if the job number estimate was reasonable.

29

For these reasons, as was the case in *Christopher O.*, "[w]ithout further explanation or supporting data, Dr. Johnston's testimony alone does not constitute substantial evidence to support the ALJ's determination that Plaintiff can perform a significant number of jobs in the national economy." *Id.* at *5. *See also Carla S.*, 2024 WL 113961, at *12 (N.D. Ill. Jan. 10, 2024) ("And although the burden is on the ALJ at step five of the social security analysis, the ALJ did not ask any questions further probing into the VE's methodology. The ALJ's decision ignored the issue entirely. The circumstances in which other courts found a VE's methodology reliable are not present here.") (collecting cases) (noting expert did not explain why her reliance on the equal distribution method was reliable, or whether or how the expert relied on her knowledge or experience in reaching her estimates).

The Court acknowledges the job positions identified by the expert in this case may be common and to some extent it is difficult to believe such jobs are not available in significant numbers in the national economy. *See Chavez*, 96 F.4th at 1021–23 ("The jobs [the vocational expert] identified and the ALJ ultimately relied on— cleaner, office helper, and storage rental clerk—are prevalent within the national economy. [Claimant] 'cannot credibly argue' that these jobs, which are 'commonly found in the national economy,' do not exist in significant numbers.") (internal citations omitted); *Daniel L. v. Dudek*, 2025 WL 1134217, at *12–13 (N.D. Ill. Apr. 16, 2025) (finding claimant's argument challenging vocational expert's estimate of available cashier jobs in the national economy unpersuasive, considering that such jobs are common and prevalent in the national economy). On the other hand, the

Seventh Circuit has cautioned against relying on large job number estimates while disregarding the unreliability of the method used by the expert to explain those numbers. *See Brace v. Saul*, 970 F.3d 818, 823 (7th Cir. 2020) (". . . the ALJ reasoned that the jobs number cited by the expert was so large that '[e]ven if the methodology used create[d] a significant margin of error[,] ... a significant number of jobs exist that can be performed by the claimant.' . . . An unreliable job-number estimate cannot be considered reliable merely because it is large.") (quoting *Chavez*, 895 F.3d at 970). In this Court's view, this does not elevate form or substance; it acknowledges that there must be substantial evidence in the record to support the ALJ's decision.

Finally, Claimant identifies an additional potential error with respect to whether the RFC was consistent with the jobs identified by the vocational expert and relied on by the ALJ at Step Five. Claimant argues the vocational expert identified jobs that were inconsistent with an RFC limiting Claimant to only occasional contact with supervisors because more extensive contact would be required during the training or probationary period for such SVP:2 level jobs. Motion [ECF No. 22] at 22-23. "Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation" and "[t]his training may be acquired in a . . . vocational environment" including "on-the-job training. . ." which includes "serving as learner or trainee on the job under the instruction of a qualified worker." An SVP:1 job requires training of a "[s]hort demonstration only" while an SVP:2 job requires "[a]nything beyond short

demonstration up to and including 1 month." *See Dictionary of Occupational Titles*, Appendix C - Components of the Definition Trailer, 1991 WL 688702.

When questioned by Claimant's attorney about whether Claimant could complete the training for the jobs identified by the vocational expert while being limited to occasional contact with supervisors, the expert explained "typically these jobs a person is given a short demonstration and then told to go to work. And then the supervisor would check on them throughout the day to make sure they're doing the job right. But not necessarily more than occasional. So, I have no basis to give an opinion as that . . . would violate the restriction." (R.1517). Claimant says the expert's description sounds more like the training required for an SVP:1 level job, yet the expert acknowledged the jobs he identified were SVP:2, which Claimant says by definition require more training than a "short demonstration." Motion [ECF No. 22] at 22-23. *See* (R.1504).[7]

---

[7] Claimant cites *Miller v. Comm'r of Soc. Sec.,* which found that limiting a claimant to jobs requiring a "short demonstration" for training contradicts a restriction to SVP:2 level jobs:

> The ALJ's limitation of Plaintiff to job training that requires only a "short demonstration" is in direct conflict with his statement that such a demonstration is "consistent with an SVP code of 2." (Tr. 25.) SVP code 1 allows for jobs that require a "[s]hort demonstration only." *See Dictionary of Occupational Titles*, Appendix C –Components of the Definition Trailer (4th ed. 1991), 1991 WL 688702 ("DOT"). However, SVP code 2 allows for jobs that require "[a]nything beyond short demonstration up to and including 1 month." See *id.* (emphasis added). Therefore, the ALJ's RFC is patently contradictory and does not allow for meaningful review.

*Id.*, 2022 WL 17812870, at *3 (M.D. Fla. Nov. 2, 2022), *report and recommendation adopted sub nom. Miller v. Comm'r, Soc. Sec. Admin.*, 2022 WL 17352294 (M.D. Fla. Dec. 1, 2022). While the Commissioner says there is no restriction to "short demonstrations" in the RFC here, the reasoning in this case nonetheless raises the question of whether the SVP:2 jobs identified by the vocational expert would require only a "short demonstration" or if that is inconsistent with the DOT explanation of the training levels for SVP:2 jobs.

The Commissioner responds that the vocational expert explained that, based on his experience, the training period for the identified jobs would not necessarily require more than occasional contact with supervisors. Response [ECF No. 26] at 18-19 ("The VE repeatedly affirmed that the process of learning the jobs listed would *not* require more than occasional interaction with other people because, based on his experience, they typically required just a short demonstration to learn."). The Commissioner's response seems to be based on an assumption, possibly in conflict with the DOT explanation of the training required for SVP:2 jobs, that the training for the identified jobs could be accomplished with a short demonstration. As explained above, the DOT provides that SVP:2 level jobs require more training than can be accomplished in a short demonstration. It is unclear from the record, however, whether the more extensive training an SVP:2 job entails would necessarily require more than occasional contact with supervisors during the training period. (R.1517 (". . . in so having watched these jobs and over the years had clients that went to work in these types of jobs, let's just say my experience . . . I can't say that they require more than just occasional contact."); *see also* R.1518-19). Ultimately, because the ALJ did not address the level of supervisor contact required during a probationary or training period for the identified jobs in the opinion (R.741-43), it is unclear whether the extent of supervisor interaction required during any probationary or training period for the identified jobs would be consistent with the RFC limiting Claimant to occasional interaction with supervisor. Thus, this issue should also be addressed on remand.

For all the above reasons, remand is required because the Court does not understand the vocational expert's methodology as articulated in the record and therefore cannot conclude it provided substantial evidence for the ALJ's determination that significant potential jobs exist for Claimant. Accordingly, "a new step-five hearing is needed to explore the evidentiary gap in this case." *Ruenger*, 23 F.4th at 764. The Court is not making a finding as to whether or not there are jobs available in sufficient numbers, but is remanding so that the basis for the vocational expert's job estimates can be explored more thoroughly. The Court expresses no opinion on the decision to be made on remand.

### B. Claimant's remaining challenges to the ALJ's opinion do not warrant remand.

Although the Court finds remand is appropriate based on the Step Five analysis, the Court addresses the other issues raised by Claimant in order to make clear the narrow basis for this second remand in this case.

### a. The RFC was supported by substantial evidence.

Claimant challenges the ALJ's RFC as not supported by substantial evidence because the ALJ did not address evidence regarding Claimant's optic neuralgia and headaches, or concentration, persistence and pace restrictions, and the RFC did not include limitations warranted by that evidence, such as a restriction to one to two step tasks.

### i. ALJ did not ignore evidence regarding Claimant's optic neuralgia and headaches.

Claimant contends the ALJ erred because notwithstanding the finding that Claimant's optic neuralgia[8] was a severe impairment, a condition Claimant says causes headaches, the RFC does not account for his headaches. Motion [ECF No. 22] at 17-18. Claimant contends the "ALJ's decision failed to discuss what functional limitations [Claimant] experienced as a result of the headaches or how those limitations were reflected in the RFC." [*Id.*] at 18.

The Court disagrees. The ALJ described Claimant's testimony regarding his headaches including "headaches that comes and goes daily and lasting for about an hour" and that "go away after taking his medications and return in four hours" noting Claimant testified "[w]hen he has a headache, he tries to close his eyes, puts his hands over the eyes due to eye soreness, and/or put his head down." (R.735.) The ALJ concluded that Claimant's allegations about the severity of his symptoms were inconsistent with the objective medical evidence, as well as his ability to engage in daily activities. (R.736.) The ALJ extensively discussed the evidence related to Claimant's optic neuralgia and headaches, which the ALJ found reflected conservative treatment, denial of headaches or pain that interfered with activities on several occasions, and reports of improvement with medication:

> Concerning the claimant's blindness of right eye; optic neuralgia (23F/121-126); and headaches, magnetic resonance angiography in January 2016 revealed no abnormalities (2F/15). In July 2016, he acknowledged that pain did not interfere with his activity levels (2F/7). He also reported seeing an ophthalmologist one year before (2F/8). Thus, he was referred to ophthalmology (2F/10). Pain remained causing no

---

[8] Claimant refers to this condition as "occipital neuralgia." Motion [ECF No. 22] at 17. As the Commissioner does not address this naming discrepancy, the Court assumes this is the same condition the ALJ identified as "optic neuralgia." *See* (R.724, R.736.)

35

interference in activities in January 2017 (2F/27). He denied headaches in March 2017 (24F/21). In May 2017, the claimant noted headaches coming and going (1F/8). Nevertheless, he reported Naproxen somewhat working, and no neurologic disease was exhibited (1F/9). It was determined that he should be managed with block and physical therapy (1F/12)/ Within the same month the claimant identified headaches as a side effect of Lexaprox, for which he requested his dose to be lowered (2F/19). The claimant continued to be conservatively treated for headaches (2F/37). Left eye displayed 20/20 vision upon examination (3F/3), and the claimant displayed no difficulties while moving about (3F/6). Headaches had subsided by August 2017 (8F/7).

****

The claimant returned to a neurology consultation in November 2020, when he acknowledged gabapentin helping and headaches doing ok. He rated his symptoms as a 3 to 4 on a scale from 1 to 10, and denied nausea, vomiting, photophobia or phonophobia. He also stated that ibuprofen and naproxen helped with the symptoms (23F/145). In December 2020, the claimant had not engaged in physical therapy for headaches (23F/122). Nevertheless, he continued to report that Gabapentin helped. He was doing ok; rated headaches as 3 to 4 on a scale from 1 to 10 . . . (23F/122).

(R.736.) The ALG also discussed headache references in relation to the medical evidence regarding Claimant's post cerebrovascular malformation and dural arteriovenous fistula:

No cardiovascular abnormalities were noted in May 2017 (1F/11), when it was determined that he should undergo imaging testing after been tested for the last time in 2013 (1F/12). No cranial nerve deficits were displayed upon exam (7F/18); and head MRA test revealed no changes when compared to imaging testing performed in 2012 (12F/14). The claimant refused to undergo occipital nerve block for pain (12F/20). In December 2017, integrative functions, cranial nerves, and carotid arteries were normal (12F/24). An EEG was unremarkable (12F/35). He acknowledged Depakote relieving headaches (12F/53); and worsening with Dibaltroex Soder (12F/54). Through October 2018, the claimant was observed in stable condition (9F/1; 12F/61). He reported doing well and experiencing 60% less headaches (12F/98).

36

(R.737.) Although the ALJ did not include any limitations specifically to address Claimant's headaches, Claimant does not identify any additional restrictions that he says should have been included to accommodate his headaches or optic neuralgia. Accordingly, the Court finds the absence of any restrictions related to Claimant's headaches in the RFC is supported by substantial evidence.

### b. ALJ's decision not to include any one to two step task restrictions in the RFC based on evidence of Claimant's concentration, persistence or pace limitations was supported by substantial evidence.

As an initial matter, the Court notes the basis for the initial remand in this case was the need for reconsideration of the RFC to adequately address Claimant's mental limitations, including specifically his deficiencies in the functional area of concentration, persistence, and pace. (R.802-803 ("The ALJ should then explain, with support from the medical record, how the restrictions in the RFC address Claimant's specific mental limitations involving concentrating, persisting or maintaining pace.")). Following remand, the ALJ found Claimant had a severe impairment of alcohol use disorder, noting records reflected "he had a long history of alcohol use disorder" and "was diagnosed with severe alcohol abuse disorder" following a hospitalization around Thanksgiving 2018. (R.724, R.726). The ALJ concluded that Claimant had an extreme limitation in concentrating, persistence and pace including the substance use disorder, but that Claimant did not have any limitations in concentrating, persisting or maintaining pace absent the substance use disorder. (R.726-27, R.733, R.738-39). Notably, Claimant does not challenge the ALJ's finding that he had a

37

severe impairment of alcohol use disorder or that Claimant's alcohol use was material to a finding of disability.[9]

The ALJ identified record evidence in support of her finding that Claimant did not have any limitations in concentrating, persistence and pace if substance abuse was stopped:

> The evidence shows that the claimant displays orientation, thought process, coherency, and no more than mild deficits in working memory (4F/5). The claimant can complete personal care, drive, shop in stores, work part time, take care of his child, do the dishes, and needs no reminders (5E/5-7). Upon examinations, he displayed normal concentration and attention (1F/11; 2F/19; 23F/106), with ability to comprehend (24F/82). Moreover, his treating physician reported that he can function well while performing low stress work (25F/3). In addition, the psychiatry expert testified at the hearing that the claimant displays no difficulties in this area of mental functioning. Therefore, he determined that the claimant need a low stress environment meaning simple, and repetitive work, which is not based on the issue of concentration, but more with the fact the claimant experiences troubles with stress (Hearing recording). As such, the undersigned limited the claimant to work requiring a low stress environment involving simple repetitive tasks.

(R.733). Claimant does not challenge or even address most of the evidence identified by the ALJ. Motion [ECF No. 22] at 16-17.

---

[9] The initial ALJ opinion similarly noted that Claimant was assessed with alcohol use disorder during an inpatient admission in November 2018 and that Claimant testified he had regularly been drinking more than 20 drinks of alcohol per week before that hospitalization, but also noted he said he had been sober between 2015 and 2017. (R.16). The ALJ stated Claimant "did not testify to any work-related limitations caused by his history of alcohol use disorder." (*Id.*) Thus, in the initial opinion, the ALJ did not find Claimant had a severe impairment of alcohol use disorder and did not address whether Claimant's substance abuse was material to any finding of disability.

One of the pieces of evidence cited by the ALJ was an August 2017 consultative examination report from psychiatrist Dr. Friedman (Exhibit 4F) which the ALJ said showed Claimant "displays orientation, though process, coherency, and no more than mild deficits in working memory." (R.733). The ALJ also concluded that Dr. Friedman's opinion supported Claimant's ability to perform simple and repetitive tasks, a finding that Claimant does not challenge. (R.740). Instead, Claimant contends "[l]imiting the complexity of a task does not address the individual's ability to continue to perform a task over an extended period." Motion [ECF No. 22] at 17 (citing *Varga v. Colvin*, 794 F.3d 809, 814-15 (7th Cir 2015) and *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)).

Claimant's position fails to address the nuance of such limitations. As the Court previously addressed in its opinion on the first remand, "[i]n other circumstances, . . . a limitation to unskilled work can account for concentration difficulties if the record indicates that it addresses the underlying symptoms." (R.798). The ALJ addressed this on remand by explaining that limiting Claimant to simple repetitive work was intended to accommodate Claimant's symptoms of stress, rather than difficulties in concentration. (R.739). The ALJ found persuasive the opinion of the testifying psychiatry expert (Dr. George S. Bell) at the hearing on remand, who reviewed the full record, including information that post-dated the state agency consultant assessments, and considered Claimant's testimony at the hearing. (R.730). Dr. Bell opined that Claimant "displays no difficulties in this area of mental functioning." (R.733). Dr. Bell concluded that Claimant had extreme limitation in

concentration, persistence and pace due to the substance abuse disorder, from the alleged onset date through November 27, 2018, when Claimant experienced a violent episode due to an alcohol relapse. (R.729). When sober, however, Dr. Bell found Claimant did not have any limitations that were documented in the record in concentration, persistence and pace. (R.733). Dr. Bell testified that the record supported that Claimant required a low stress work environment and this could be accommodated by limiting him to simple repetitive work. (R.730).[10]

Although Claimant does not address the evidence cited by the ALJ in support of her finding that he had no limitations in the area of concentration, persistence and pace, Claimant says the ALJ ignored evidence that he had more than minimal impairment in this functional category, noting the vocational expert testified that any additional impairment in this regard would preclude Claimant's ability to perform the jobs identified at Step Five. Motion [ECF No. 22] at 16-17, 20-22. Specifically, Claimant points to the opinions of state agency consultants finding he had moderate limitations in this area, which precluded Claimant from performing jobs requiring

---

[10] Claimant argues the ALJ erred in concluding that Dr. Bell's opinion was consistent with Claimant's history of alcohol abuse, pointing to Dr. Bell's testimony that he was mistaken about Claimant's alcohol use relapsing again in September 2022. Motion [ECF No. 22] at 19. Claimant fails to adequately explain this argument. While Dr. Bell acknowledged he had mistakenly read one exhibit as referencing a September 2022 relapse, while the described incident had actually occurred in November 2018, (R.1482), Claimant fails to articulate how this undermines the ALJ's opinion or illustrates any deficiency in Dr. Bell's opinion. *See* (R.738 (finding "the evidence . . . does not suggest that [Claimant] required in-patient rehabilitation treatment after November 2018" and "[t]herefore, as determined by the psychiatry expert at the hearing, after November 2018, the claimant's alcohol abuse disorder is non-material, and does not affecting (*sic*) his ability to work within the limits included in the residual functional capacity.").

more than one to two step tasks. [*Id.*] Claimant asserts "the ALJ did not address these opinions in the decision." Motion [ECF No. 22] at 17.[11]

The Court disagrees. The ALJ provided reasons for rejecting the state agency consultant opinions. (R.730.) The ALJ found the opinions of the state agency consultants not persuasive because the consultants "had no opportunity to examine the claimant, or evaluate all the evidence in the claimant's file" and "had no opportunity to listen to the testimony of the psychology expert at the hearing, who was able to evaluate the evidence as a whole and consider the claimant's history of alcohol abuse." (R.730.) The ALJ noted "without the alcohol abuse disorder, the evidence supports that the claimant can function well while performing low stress jobs," citing a November 2022 Physical RFC Questionnaire from a doctor at Erie HealthReach Waukegan reporting that Claimant functioned well while working at a low stress job (Exhibit 25F) as well as the testimony of the expert at the hearing, Dr. Bell, who opined Claimant's need for simple repetitive work was to address his difficulties with stress rather than concentration. (R.730, R.738). Claimant fails to address the ALJ's reasons for rejecting the state agency consultant opinions.[12]

---

[11] Claimant also contends that the ALJ should have been bound by the pre-remand ALJ's opinion that he had moderate limitations in concentration, persistence and pace. Motion [ECF No. 22] at 17. This argument is not well-explained, particularly given the ALJ's explanation for why she rejected the state agency consultant opinions, which were the basis for the pre-remand opinion that Claimant had moderate limitations in this area.

[12] Dr. Bell was also asked about the state agency opinions from September 2017 (initial) and April 2018 (reconsideration) that previously found Claimant to have moderate limitations in concentration, persistence and pace. (R.95-105, R.106-118). Claimant says Dr. Bell testified that he did not find anything in the record to be inconsistent with these opinions, Motion [ECF No. 22] at 19-20, but this omits Dr. Bell's testimony that there was also nothing in the record to support the state agency consultant opinions of moderate limitations in concentration, persistence and pace. (R.1491-92).

For all these reasons, the ALJ's opinion that absent Claimant's alcohol abuse, Claimant did not have any limitations in concentration, persistence and pace warranting additional step restrictions in the RFC is supported by substantial evidence.[13]

  c. **The ALJ's evaluation of Claimant's subjective symptoms was supported by substantial evidence**.

Claimant argues the ALJ improperly discounted the limiting effects of his subjective symptoms. *See generally* Motion [ECF No. 22] at 24-28. As an initial matter, Claimant overstates the burden on the ALJ in evaluating a claimant's subjective symptoms. *Id.* at 24-25 ("The ALJ cites no evidence in the record that is directly inconsistent or in contradiction with [Claimant's] statements" and failed to explain "which allegations are or are not supported"). When assessing a claimant's subjective symptom allegations, an ALJ considers several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5-8. "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th

---

[13] Claimant also does not respond to the Commissioner's point that even if the record supported that Claimant had concentration, persistence and pace limitations that should have been accommodated in the RFC with a restriction to one to two step tasks, at least one of the three jobs identified by the vocational expert (housekeeping cleaner) would not exceed such a step task limitation. Response [ECF No. 26] at 18. Thus, if significant numbers of housekeeping cleaner jobs are found at the Step Five analysis on remand, any failure to limit Claimant to one to two step tasks would appear to be harmless.

1273, 1279 (7th Cir. 2022). "Patently wrong" means that the decision lacks any explanation or support. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Not all the ALJ's reasons must be valid in a subjective symptom analysis, "as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original).

Moreover, the Court notes Claimant raises many of the same arguments regarding his subjective symptoms that the Court rejected in its prior remand decision. (R.803-806). Specifically, the Court affirmed the prior ALJ's conclusion that "Claimant's complaints of disabling headaches, dizziness, and severe depressive and anxiety-related symptoms in this case simply were not borne out by the notes and records of his treating physicians and his mental status examinations." (R.805). The Court also found the prior ALJ "permissibly relied on evidence that Claimant's activities of daily living suggested he was not as disabled during the relevant time period as he portrayed himself to be." (R.806 (noting ALJ's appropriate consideration of Claimant's ability to "prepare simple meals, including TV dinners, take out the garbage, wash dishes, drive a car, shop in stores and care for his young son")).

Claimant similarly challenges the new ALJ opinion after remand, again arguing the ALJ improperly conflated Claimant's ability to engage in certain daily activities, including watching television, shopping, counting money and being married, with the ability to perform full time work. Motion [ECF No. 22] at 25. Claimant argues the ALJ did not explain how "using a phone to search the internet or pay bills requires the same concentration or interaction as is required for full-time

employment." *Id.* at 26. Claimant ignores, however, the ALJ's discussion of Claimant's other daily activities, including driving to work and to stores, grocery shopping, reading, cleaning, preparing snacks, and caring for and interacting with his children. (R.736). The ALJ considered Claimant's ability to "complete personal care activities, take care of his son, drive, shop" as well as work part time and do the dishes, all without needing reminders, along with other objective medical evidence, in reaching her conclusion that Claimant had no more than mild limitations in understanding, remembering or applying information and no limitations in concentrating, persisting, or maintaining pace. (R.733). Nor does Claimant acknowledge inconsistencies in his testimony regarding his ability to perform household chores that was identified by the ALJ. (R.736). The ALJ also contrasted Claimant's testimony with his ability to perform certain daily activities. For instance, while Claimant points to his right eye blindness, the ALJ noted he "can read, can see things in (*sic*) the floor, open doors, and drive." (R.735).

Claimant also says the ALJ improperly focused on his ability to perform part-time work to conclude he was capable of full-time work. Motion [ECF No. 22] at 27. The Court disagrees. The ALJ considered Claimant's ability to perform part-time work in evaluating the severity of his impairments and symptoms. For example, the ALJ considered Claimant's ability to work part-time in evaluating his abilities in concentrating, persisting, and maintaining pace. (R.733). The ALJ also noted that although Claimant testified to daily headaches, dizziness, difficulty working around others, temper tantrums, and side effects from medications including grogginess,

44

hand tremors, and sleepiness, "these side effects do not prevent him from working part-time." (R.735). The ALJ also noted Claimant had not left his part-time job early due to any of his symptoms. (R.736).

The ALJ also weighed the objective evidence against Claimant's allegations regarding his symptoms. With respect to Claimant's vision, the ALJ acknowledged his testimony about his right eye blindness and rejected the state agency consultant opinions finding no vision limitations, but the ALJ also noted reports documenting Claimant's 20/20 vision in his left eye, as well as his use of over the counter reading glasses and stable distance vision. (R.735, R.736, R.740-41). Based on the record evidence as well as Claimant's daily activities (discussed above), the ALJ concluded Claimant "is able to avoid ordinary hazards in a workplace, such as doors ajar and boxes on the floor, and was otherwise limited to reading ordinary print and performing tasks that do not require precise depth perception. (R.734, R.740-41).[14]

Although the ALJ acknowledged Claimant's testimony of daily headaches anxiety and side-effects from mental health medications including grogginess, hand tremors, and sleepiness, the ALJ also considered reports where Claimant denied pain from headaches interfered with his activities in January 2017, denied headaches in March 2017, and reported headaches had subsided by August 2017. (R.736). At other points, the ALJ noted records showing medications were helping Claimant's headache symptoms. (R.736-37).

---

[14] Although Claimant argues certain records cited by the ALJ "show he was observed to have decreased vision and was complaining of blurred vision," Motion [ECF No. 22] at 24, he fails to explain why that is inconsistent with the vision limitations the ALJ included in the RFC.

The ALJ also discussed multiple reports over the years where Claimant denied symptoms from his depression and anxiety. (R.737-38). Claimant argues the ALJ's focus on these reports ignores that many mental illnesses are characterized by waxing and waning symptoms, and he points to evidence of his symptoms of anxiety, crying or irritability, drug-induced tremors, or flat effect or slowed speech. Claimant fails to explain how these symptoms interfered with his ability to work or necessitated additional limitations in the RFC. Motion [ECF No. 22] at 28. Moreover, as the Commissioner notes, Claimant does not address his symptoms and functioning while sober as compared to during periods when he suffered from alcohol abuse. *See* Response [ECF No. 26] at 14-15. Claimant also does not address other opinion evidence relied on by the ALJ in evaluating his depression and anxiety. The ALJ found partly persuasive the residual functional capacity report submitted by Dr. Gibbs in November 2022, which acknowledged Claimant's depression and anxiety, but noted Claimant was functioning well working at a low stress job without any absences, as well as the report of Dr. Friedman, which supported Claimant's ability to perform simple, repetitive tasks. (R.740).

Based on this record, the Court, once again, cannot reasonably say the ALJ's consideration of Claimant's symptoms lacks any explanation or support. The ALJ relied on treatment records showing improved or lessened symptoms and examinations without reports of substantial functional limitations, Claimant's ability to engage in daily activities, and the opinions of the testifying expert, as well as other opinion evidence, in finding Claimant's alleged symptoms were not as disabling as he

46

claimed. With multiple citations to the record, the ALJ discussed and analyzed Claimant's alleged symptoms and reasonably determined that some of his symptoms were not fully corroborated by the record. *See Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) ("Because the ALJ's weighing of [claimant's] reported symptoms in the context of the whole record is supported by substantial evidence, we find no reversible error on this front either."); *Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021) ("[T]he ALJ's credibility determination was not 'patently wrong,' because she found [claimant] not credible for several reasons that were adequately supported by the record.") (citation omitted); *Lacher v. Saul*, 830 F. App'x 476, 478 (7th Cir. 2020) ("The ALJ's rationale here was thin, but it was adequate to reflect her conclusion that the objective medical evidence and [the claimant's] daily activities did not corroborate his subjective symptoms.").

Claimant's burden on review of the ALJ's decision is a heavy one, and he has to show the ALJ's assessment of his symptoms was "patently wrong" which means that the decision "lacks any explanation or support." *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). In the Court's view, Claimant falls short of that mark here. Although Claimant disagrees with the ALJ's assessment and wants the evidence to be weighed differently, he has not shown the ALJ's evaluation of his symptoms was not supported by the evidence. *See Horr v. Berryhill*, 743 F. App'x 16, 19-20 (7th Cir. 2018). The Court does not find any reversible error in the ALJ's assessment or how he evaluated Claimant's symptoms,

47

his daily activities, or his ability to perform part-time work without interference from his symptoms.

## CONCLUSION

Accordingly, for all the reasons set forth above, Claimant's request for remand in his Opening Brief [ECF No. 22] is granted and the Commissioner's Motion for Summary Judgment [ECF No. 25] is denied. The case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: July 28, 2025